406 S.E.2d 58

**BANK OF CHAPMANVILLE, a West Virginia Banking Corporation,**

**Appellee,**

v.

**Ralph WORKMAN and Donna Workman, Appellants.**

**No. 19937.**

Supreme Court of Appeals of West Virginia.

Submitted May 15, 1991.

Decided June 6, 1991.

Paul R. Sheridan, Appalachian Research and Defense Fund, Logan, for appellants.

Charles T. Bailey, Logan, for appellee.

NEELY, Justice:

This case involves the "commercial reasonableness" under *W.Va.Code* 46-9-504 [1974] and 46-9-507 [1963] of a secured

creditor's sale of repossessed collateral. The central question here is whether the secured creditor, the Bank of Chapmanville, sold the home of the debtors, Ralph Workman and Donna Workman, in a commercially reasonable manner after the Workmans defaulted on their mobile home loan. The trial court decided that the Bank's sale of the mobile home was commercially reasonable as a matter of law, and directed a verdict in favor of the bank on both the bank's claim for a deficiency judgment and on the appellants' counterclaim for actual and statutory damages. After reviewing the record, we reverse the trial court's directing of verdicts for the Bank, because the Workmans adduced ample evidence from which a jury reasonably could conclude that the Bank's sale of the Workmans' mobile home was not commercially reasonable.

On 26 July 1982, the Workmans bought a 1982 Duke mobile home, and entered into an installment loan contract with the Bank, whereby the Workmans promised to pay $38,703.60 ($18,779.00 as principal, $19,924.60 as finance charge) in 120 monthly payments over a period of ten years, and gave the Bank a security interest in the mobile home.

Five years later, the Workmans failed to make the June and July 1987 payments, and on 19 August 1987, the Bank sent them a written "notice of right to cure default." On 24 August 1987, Ms. Workman met with the Bank's loan officer, Charles Dale. The Bank claims that Ms. Workman told Mr. Dale that she and her husband could no longer afford the mobile home and that the Bank could repossess it. The Workmans, on the other hand, contend that they attempted to negotiate a schedule for catching up their payments, but that the bank insisted on repossession. On 2 September 1987, the Bank sent the Workmans a "final demand letter."

At the Bank's request, the Workmans vacated the mobile home. Later they moved to North Carolina. There is conflicting evidence in the record about whether Ms. Workman provided the Bank with their address and telephone number in North Carolina.

On 26 September 1987, the Bank sent to appellants by certified mail a "notice of public sale" dated 25 September 1987. The Bank sent the notice to the same address to which it had sent the "notice of right to cure default" and the "final demand letter," both of which the Workmans had received. The "notice of public sale" was returned "unclaimed" around 15 October 1987.

The Bank placed a single "notice of public sale" in the legal notices section of the 1 October 1987 issue of the *Logan Banner* newspaper, and posted a copy of the notice in the courthouse. The public auction took place on 23 October 1987, but no bidders attended, and the Bank sold the mobile home to itself for $10,614. The Bank did not have the home appraised before the public sale, but consulted the NADA guide, and the sale price was lower than the NADA reference value. Later, on 19 January 1988, the Bank had a mobile home dealer, James Ball, appraise the mobile home, and Mr. Ball stated that the value was $12,000. However, he appraised the mobile home at the price *he* would pay for it, taking into account an estimated cost of $2,000 to move it to his lot for showing and then to move it to where the ultimate purchaser wanted it.

The Bank applied the sale price to the balance owed by the Workmans, leaving a deficiency of $7,873.25, as of the date of sale. On 29 February 1988, four and one-half months after repossession, the bank sold the mobile home to a private person, Michael Mays, for $13,000.[1]

I

 When the Bank sold the mobile home to Mr. Mays, it did not credit its net

---

1. In all fairness to the Bank, the credit terms could account for some of the difference between the price at this sale and the price at the repossession sale. The later sale was a credit sale, while the repossession sale was a cash sale, and the Bank required of Mr. Mays only $100 as down payment. Purportedly the Bank gave Mr. Mays a lower interest rate than it normally gave on used mobile homes.

profit from that sale to the Workmans' deficiency debt. This, by itself, is not improper. If a secured creditor buys a repossessed good from itself at a public sale conducted in a commercially reasonable manner, and then resells for a higher price, the secured creditor has done nothing wrong, provided the creditor's purchase price is not unreasonably low. However, if a secured creditor buys low at its own commercially unreasonable "public sale," and only after this sale earnestly attempts to sell the good in a commercially reasonable manner, its behavior is at least as bad as that which the statutory damage provisions of *W.Va.Code*, 46-9-507 [1963] are designed to discourage.[2] The Workmans allege that the Bank has engaged in this kind of misconduct, and thus should be barred from seeking a deficiency judgment and be made to pay statutory damages.

*W.Va.Code*, 46-9-504 [1974], governs the secured party's resale of collateral upon default. *W.Va.Code*, 46-9-504(1) [1974] provides:

A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any *commercially reasonable* preparation or processing. Any sale of goods is subject to the article on sales (article 2) [§ 46-2-101 et seq.]. The proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorney's fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

*W.Va.Code*, 46-9-504(3) [1974], specifically governs the creditor's disposition of collateral:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable*. Unless collateral is perishable or threatens to decline speedily in value or is of a type

2. *W.Va.Code*, 46-9-507 [1963] provides:

(1) If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price.

(2) The fact that a better price could have been *obtained* by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to

establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

customarily sold on a recognized market, reasonable notification of the *time and place* of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale. [Emphasis added.]

The Bank's 25 September 1987 "notice of public sale" provided:

### NOTICE OF SALE UNDER SECURITY AGREEMENT

Notice is hereby given that the undersigned Secured Party, Bank of Chapmanville, a West Virginia Banking Corporation, of Chapmanville, West Virginia by virtue of authority of that certain Security Agreement dated July 26, 1982 from Ralph Workman and Donna L. Workman, of Chapmanville, "DEBTOR", to Bank of Chapmanville as "Secured Party", covering the property hereinafter described, default having been made thereunder by said Debtor, said Bank of Chapmanville will, on Friday, October 23, 1987, at the hour of Eleven o'clock a.m., sell at public auction *at the front step of the mobile home in Garretts Fork, Logan County, West Virginia,* that certain mobile home described in said Security Agreement as follows: ˙1982 Duke 14 × 70 mobile home, Serial Number 10068.

Terms: Cash in hand on day of sale.
Dated: September 25, 1987.

Bank of Chapmanville, a West Virginia Banking Corporation, of Chapmanville, West Virginia.

By: Charles Dale

Its: Loan Officer [Emphasis added.]

 We will not dwell on whether the Workmans ever provided the Bank with a North Carolina address to which the Bank could send the notice of sale. There was conflicting evidence, and the jury should have been allowed to resolve that question of fact. However, even if the jury were to find that the Bank made an adequate attempt to give the Workmans notice of the public sale, there are three aspects of the published notice that a jury could find disturbing: 1) there is no specific address; 2) there is no telephone number given for inquiries about the mobile home; and (3) there is no mention of an opportunity to inspect before sale. We do not say that these deficiencies would render every public sale commercially unreasonable, but they are enough to convince us that the trial court erred in directing a verdict for the Bank.

 In Syllabus Point 5 of *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973), we stated that, "[u]pon a motion for a directed verdict, all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." The trial court fell short of resolving all reasonable doubts and inferences in favor of the Workmans.

*W.Va.Code,* 55–12–2 [1969], although applicable only to sales of real estate, gives some guidance about what a notice of public sale should contain. In particular, it provides that a sale should be advertised in a local newspaper, and that in the advertisement, the commissioner should state, "the time, terms and place of sale, together with a description of the property to be sold...." In the case before us, although the place of the public sale would be clear to the Workmans (had they received the notice) because they know where they used to live, it is not likely that all potential buyers would know where the mobile home was located from the description given.

Because there was no other advertisement for the "public sale", this legal notice had to serve as an effective advertisement to potential buyers, as well as serve as notice to the debtors. Thus, the sufficiency of the notice's description of the location of the public sale goes to the issue of commercial reasonableness of the sale.

The Bank points out that Garretts Fork is a rural community without road names and numbers. Thus, it might be awkward to give the address, or rather directions, in the notice. However, the Bank did not even place a "For Sale" sign on the mobile home, and the record suggests that there are many mobile homes in Garretts Fork. The only way a potential buyer would know where to look for the mobile home would be to call the Bank, and the Bank's notice of public sale did not encourage such inquiries by giving a telephone number to call for information.[3] Of course, a truly diligent mobile home buyer *could* call the Bank and ask to speak with the person in charge of repossession sales. However, most sellers do not make it that hard for potential buyers to inquire about their goods, and a jury reasonably could conclude that the Bank was not very interested in selling the mobile home at the public sale, and only ran the notice as a formality.

■ After selling the mobile home to itself at the repossession sale, the Bank placed the following advertisement in the classified advertisements section of the *Logan Banner* newspaper:

> Repossessed Mobile Homes For Sale.
> 1972 10 × 50
> 1980 12 × 70
> 1982 14 × 70
> Call 752–7000 or 855–7000 for prices.

The mobile home involved in this case is the 1982 model with dimensions of 14' ×70'. Although this advertisement falls far short of a full page color advertisement, it does, at least, contain the telephone number of the seller. The trial court would not allow the Workmans to present evidence concerning the later advertisement. The Workmans wanted to show that the Bank had one standard of what was commercially reasonable when selling for the Workmans' account, and another when selling for its own account. The newspaper advertisement should have been allowed into evidence, because its probative value far outweighed the possible unfair prejudice to the Bank. Any potential unfair prejudice could be cured with an instruction to the jury to the effect that a secured creditor is not required to use the same selling method when reselling goods for its own account as it uses at a repossession sale.

In response to the Workmans' contention that they should have been allowed to show that the later advertisement was in the classified advertisements section under "Mobile Home Sales", and contained the Bank's telephone number, the Bank said:

---

3. It could be that most of the potential buyers knew where in Garretts Fork the Workmans lived, or knew how easily to ascertain the exact location.

The number of mobile homes in Garretts Fork could be relevant to the issue of the adequacy of the Bank's description of the location of the public sale. Ms. Workman apparently counted the mobile homes in Garretts Fork in 1990, and was ready to testify to that number, but the Court, on the Bank's objection, excluded the evidence, saying:

> Didn't you ask her the question [sic] the last two weeks? We're talking about '87 here and what difference does it make if there were a thousand or ten?

The trial court's comment, "What difference does it make if there were a thousand or ten?", showed that he misunderstood the Workman's argument that the location given in the notice was inadequate. If there were 1,000 mobile homes in Garretts Fork, then the Bank's description of the location of the public sale seems a lot less specific than if there were only ten mobile homes.

When the Workmans' lawyer, Mr. Sheridan, attempted to respond, "Well, the difference is —," the Court cut him off, saying only, "—Well, I'm sustaining the objection. Now go ahead Mr. Sheridan." Ms. Workman's lawyer then asked her, in effect, to guess at the number of mobile homes back in 1987, and the Court prevented Ms. Workman from answering.

Unless Garretts Fork has experienced a population explosion, or at least a mobile home boom, in the last three years, it is likely that the number of mobile homes in 1990 is not very different from the number in 1987. At any rate, someone who has actually counted the mobile homes recently, and who lived in Garretts Fork in 1987, would probably be able to make a fairly accurate guess at the number in 1987.

Although this would appear to be more of a distinction than a difference, it should be recognized that the public sale was a *compulsory* foreclosure sale, with time constraints, under a Security Agreement and the *Uniform Commercial Code*.

The subsequent sale was not compulsory and did not involve any time constraints nor any contractual or legal repercussions with respect to the manner in which it was conducted. [Emphasis in original.]

It does not take long to put a telephone number into an advertisement, so "time constraints" do not explain the difference between the two advertisements. The Bank is correct that the law does not allow it to retain a repossessed mobile home for a long time before selling it for the debtors' account.

## II

We do not decide whether, as a matter of law, the Bank's sale of the mobile home was commercially reasonable. There is enough conflicting evidence on this issue that it can only be decided by the jury. If, on remand, the jury finds that the Bank's sale of the mobile home was commercially unreasonable, there will be the question of whether a secured creditor's commercially unreasonable disposition of collateral bars it from seeking a deficiency judgment. We have not yet addressed this issue.

Courts around the country have chosen from among the following three rules: (1) the "absolute bar" rule; (2) the "set-off" rule; and (3) the "rebuttable presumption" rule.[4] The "rebuttable presumption" rule appears to have become the majority rule, and is the soundest of the three. Not surprisingly, it is the rule that the federal court for the Southern District of West Virginia already has adopted in *Matter of Appalachian Pocahontas Coal Co.*, 31 B.R. 579 (S.D.W.Va.1983).

Under the "absolute bar" rule, any secured creditor who is found to have disposed of the collateral in a commercially unreasonable manner is absolutely barred from seeking a deficiency judgment. There are several problems with this rule. First, it is a judge-made punitive provision. *W.Va.Code*, 46–1–106(1) [1963], states the UCC's policy favoring compensation of aggrieved parties, but urging that courts not create new penalties in commercial contexts:

> The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this chapter or by other rule of law.

Second, there is absolutely no support in the wording of the UCC for the "absolute bar" rule. Third, the "absolute bar" rule involves a forfeiture, and the law generally disfavors forfeitures. Fourth, the amount of the penalty bears no relation to the degree of commercial unreasonableness of the secured creditor's conduct, but depends solely upon the amount of the deficiency. That is, a creditor who is owed a deficiency of one million dollars can be penalized more for *slightly* commercially unreasonable conduct than a thoroughly abusive creditor who is left with a deficiency of one hundred dollars.

At the other extreme, under the "set-off" rule, the creditor collects a deficiency judgment, subject only to whatever statutory damages are awarded to the debtor on a counterclaim under UCC 9–507(1), *W.Va. Code*, 46–9–507(1) [1963]. The main problem with this rule is that the debtor has the burden of proving his losses under UCC 9–507, and will usually have a hard time proving that the fair market value was higher than what the collateral actually sold for at the repossession sale. In many cases, the secured creditor's commercially unreasonable behavior (*e.g.*, lack of adequate notice to the debtor) will have great-

---

**4.** For enlightening discussions of the three rules, *see,* D. Blinn, "Secured Transactions: A Secured Party's Right to a Deficiency Judg-ment," 1986 *Ann.Surv.Am.* L. 775, and *Matter of Appalachian Pocahontas Coal Co.*, 31 B.R. 579 (S.D.W.Va.1983).

ly hindered the debtor's ability to prove his damages.

Thus, the debtor may be in a position similar to that of a surgery patient who has difficulty knowing what went wrong in the operating room, either because he does not understand what was being done to him on the operating table, or because he lay unconscious under a general anesthetic during the surgery. Like the surgery patient, the debtor may have trouble determining, much less proving, what went wrong at a commercially unreasonable sale. This is especially true for the debtor who was not present at the sale, for he is like the surgery patient who was unconscious during the operation.

■ For the surgery patient, the rule of *res ipsa loquitur*, often comes to the rescue. For the victim of a commercially unreasonable disposition of collateral, the "rebuttable presumption" rule comes to the rescue. Under this rule, the fair market value of the collateral is rebuttably presumed to equal the amount of the remaining debt. To recover a deficiency, the secured creditor who is found to have disposed improperly of the debtor's collateral must prove that the debt exceeded the fair market value of the collateral.

■ It is worth noting what happens when the collateral is "consumer goods." A mobile home that a person uses as a private residence is a "consumer good." [5] So when a secured creditor makes a commercially unreasonable disposition of a mobile home, the debtor is entitled to the minimum damages provided for in the last sentence of *W. Va. Code*, 46–9–507(1) [1963]. Thus, the debtor is entitled to at least "the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price" as his damages, even if the creditor sold the good for five times the balance remaining on the loan, and gave the debtor the surplus. However, this is a *minimum* damages provision, and the debtor cannot take these damages in addition to the benefit he receives from the operation of the rebuttable presumption rule. For instance, if the amount remaining on the loan is $100,000, and the seller sells the consumer goods collateral in a commercially unreasonable manner for $50,000, and does not rebut the presumption that the collateral was worth $100,000, the debtor is not required to pay the claimed $50,000 "deficiency." This $50,000 has, in effect, been awarded to the debtor as his damages. He cannot, however, also seek minimum damages of, say $10,000, because he has received his damages through the operation of the rebuttable presumption rule.

For the reasons stated above, we reverse the circuit court's directed verdict in favor of the Bank of Chapmanville, and remand for further proceedings consistent with this opinion.

Reversed and remanded.

---

5. By contrast, when the dealer owns it and has it on his lot to sell, it is inventory.