**COMMERCIAL CREDIT EQUIPMENT CORPORATION, Respondent–Appellant,**

v.

**Paul PARSONS, Appellant–Respondent.**

**COMMERCIAL CREDIT EQUIPMENT CORPORATION, Appellant,**

v.

**Paul PARSONS, Respondent.**

**Nos. WD 43850, WD 43902.**

Missouri Court of Appeals, Western District.

Dec. 3, 1991.

---

Harold W. Fraser, Edina, for Paul Parsons.

Paul Rick Jackson, Kirksville, for Commercial Credit Equipment Corp.

Before SHANGLER, P.J., and LOWENSTEIN and BERREY, JJ.

SHANGLER, Presiding Judge.

The plaintiff Commercial Credit Equipment Corporation [CCEC] sued the defendant Paul Parsons for a deficiency after repossession and sale of the collateral under a lease agreement. The defendant pleaded that the disposition was not in a manner commercially reasonable, and counterclaimed for damages. The court found there was a deficiency and awarded the plaintiff CCEC the sum of $18,944.37 and interest as a separate judgment. The court found also that the disposition of the collateral by CCEC was not in a commercially reasonable manner, and awarded the defendant Parsons $10,000 damages as a separate judgment.

The plaintiff and defendant cross-appeal.

The judgment was accompanied by an opinion expressed as findings of fact and conclusions of law. The evidence found by the court, and otherwise compatible with its findings, was that in 1980 defendant Parsons, a row-crop farmer, purchased a 1975 Steiger Tiger II tractor. The transaction was financed through the Allis Chalmers Credit Corporation. Parsons became unable to meet the payments on the tractor, and in October of 1982 he arranged refinancing through the CCEC. The plaintiff CCEC purchased the tractor for $33,-000, discharged the Parsons debt of $25,-

116.11 on the tractor to Allis Chalmers and paid the balance of the purchase price directly to Parsons. Parsons then signed an agreement with CCEC to lease the tractor for five years for annual payments of $9,195.12 per year. The 1982 and 1983 payments were made. No further payments were made except for a $322 fee to extend the due date of the 1984 payment for three months, from November 26, 1984, to February 26, 1985. Parsons did not remit by February 26, 1985, or at any time thereafter. CCEC thereafter notified Parsons by letter that the account was past due from February 26, 1985, and in default of payment, CCEC would act under the lease agreement. CCEC repossessed the tractor on May 8, 1985, and on that day sent Parsons a written Notice of Sale of the collateral at private sale on or after May 24, 1985. Parsons received the notice on May 13, 1985, but did not respond.

CCEC arranged with Selby Implement Company to recover the tractor from the Parsons farm for storage until the sale. Selby furnished CCEC with a condition report on May 13, 1985, to help establish a sale price. CCEC then advertised the tractor for sale in *Farmers Hot Line* for two consecutive weeks. CCEC also sent bid letters to sixteen area farm equipment dealers. CCEC mailed a copy of the list to Parsons and a certification that letters of invitation to bid on the tractor were mailed on June 7, 1985, to the listed dealers. Two bids were returned, one from Selby for $5100, and the other from Mid–South Tractor for $6600. The tractor was sold to Mid–South for $6600 on September 18, 1985. CCEC notified Parsons of the sale and that after the sales proceeds, less expenses, were applied to the delinquent account, a deficiency of $18,791.37 remained.

On April 29, 1985, before the tractor was repossessed by CCEC, Parsons purchased another Steiger Tiger II tractor, very similar to the one under the lease with CCEC. The purchase was from Selby Implement Co., the dealer that was storing the tractor repossessed by CCEC. The purchase price was $21,000. Parsons paid $5000 down and financed the balance.

The trial court found that the tractor was in field-ready condition when CCEC repossessed the implement from the Parsons farm. The court found also that while in possession of its agent, Selby, the windshield and back glass of the tractor were destroyed. This damage was not repaired prior to the private sale. The court found that the $6600 bid CCEC accepted for the sale of the tractor was its salvage or junk value. It accepted as fact the evidence of Parsons' expert that the tractor had a fair market value of $27,000 at the time it was repossessed. The court noted that in 1981 Parsons had installed a nearly new engine in the tractor at a cost of $8000. The engine was capable of 10,000 hours of service and only 3220 hours had been used. The court noted also that the tractor Parsons had purchased from Selby for $21,500 was virtually identical to the tractor repossessed and sold by CCEC for $6600. That tractor, purchased from Selby to replace the tractor repossessed by CCEC was sold five years later, in the spring of 1990, for $18,000.

The court applied § 400.9–504, RSMo Supp.1991, of the Uniform Commercial Code to the transaction and determined that CCEC failed to dispose of the tractor in a commercially reasonable manner. The court nevertheless awarded CCEC a judgment of $18,944.37 for the deficiency, and to Parsons a separate judgment of $10,000 as damages.

I

### APPEAL OF PLAINTIFF CCEC

CCEC argues on appeal that the transaction with Parsons was a true lease and not a security agreement, so that Article 9 of the Uniform Commercial Code does not apply. CCEC argues that even if Article 9 applies to the transaction, the finding that the resale of the tractor was not conducted in a commercially reasonable manner was against the weight of the evidence and erroneous. CCEC argues also that the counterclaim was not proven, and so the $10,000 judgment for Parsons may not stand.

## A
### True Lease or Security Agreement

■ Section 400.9–102(2) provides that Article 9 "applies to security interests created by contract ... and lease[s] ... intended as security." Section 400.1–201(37) defines *security interest* to mean

> ... an interest in personal property or fixtures which secures payment or performance of an obligation.... Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (section 400.2–326.) Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

To sustain the argument that the transaction with Parsons was a true lease not subject to Article 9, CCEC cites elements of the writing that reserve "title at all times in CCEC," declare the agreement is intended to be a lease, and that "the relationship between CCEC and [Parsons] shall always and only be that of lessor and lessee." By the very definition of § 400.1–201(37), however, the retention of title by the lessor in a lease intended as security is not a true lease, but comes within the operation of Article 9. *See* § 400.9–102(2). Indeed, it is the very sense of *security interest* definition § 400.1–201(37) that an agreement in terms of lease may hide a secured transaction, so that the bare language does not always suffice to disclose the intention of the parties. 1 R. Anderson, *Anderson on the Uniform Commercial Code*, § 1–201:256 (3d ed. 1981). The order of inquiry as to whether the agreement is a true lease or intended for security is implicit from § 400.1–201(37). If the agreement provides that the lessee may become the owner of the property "for no additional consideration or for nominal consideration," then, presumptively, the lease is intended for security. If not, then, whether the lease is intended for security, is to be determined "by the facts of each case." *Peco, Inc. v. Hartbauer Tool & Die Co.*, 262 Or. 573, 500 P.2d 708, 709 (Or. banc 1972); *See also Lendal Leasing v. Farmer's Wayside Stores*, 720 S.W.2d 376, 379 (Mo.App.1986). The lease between CCEC and Parsons contains neither an option to purchase nor an agreement that the lessee may become the owner of the tractor upon compliance with the terms of the lease. There is nothing express in the lease, therefore, that constitutes the agreement as one intended for security. Accordingly, the direction of § 400.1–201(37) governs: "Whether [the] lease is intended as security is to be determined by the facts in each case." *Davis Bros. v. Misco Leasing, Inc.*, 508 S.W.2d 908, 911 (Tex.Cir.App.1974).

■ In such instances, the true character and intention of the agreement is determined not from random phrases or formal designations—such as "lease," "lessor," "lessee," but from the economic reality of the agreement, whatever the disguise of the terminology. *Clune Equip. Leasing Corp. v. Spangler*, 615 S.W.2d 106, 107–08[1–3] (Mo.App.1981). In that determination of ambiguity, parol evidence may be used to show that the garb of lease notwithstanding, the transaction was intended as security. *Colonial Leasing Co. v. Larsen Bros. Constr. Co.*, 731 P.2d 483, 487[9, 10] (Utah 1986). *See also Lendal Leasing, Ltd. v. Farmer's Wayside Stores*, 720 S.W.2d at 379. And, indeed, Parsons' oral testimony as to what the signatories intended by the terms of agreement was received, but without probative effect. His evidence, that he was "led to believe" that at the end of the five year term he could purchase the tractor "if the price was acceptable"—but with "no idea" whether it would be for "some sort of scrap value or fair market value"—was simply inconclusive for inference of either lease or sale.

■ There are regular factors that bear on whether the terms of an agreement are

meant as a true lease or for security. Among them are that (1) the lessee is required to insure the goods in favor of the lessor, (2) the lessee bears the risk of loss or damage, (3) the lessee is to pay for taxes, repairs, and maintenance, (4) the agreement establishes default provisions governing acceleration and resale, (5) the warranties that usually attend true leases of such goods are expressly disclaimed and excluded, (6) the lessor lacks facilities to store or retake the goods. *Colonial Leasing Co. v. Larsen Bros. Constr. Co.*, 731 P.2d at 487[9–10]. *See also,* J. White & R. Summers, *Uniform Commercial Code* § 22–3 (2d ed. 1980). These elements were all present in the lease transaction between CCEC and Parsons. They sustain the finding that the lease created a security interest. *In re Kempker*, 104 B.R. 196, 203 (W.D.Mo.1989); *All–States Leasing Co. v. Ochs*, 42 Or.App. 319, 600 P.2d 899 (1979).

■ That the designated "lessor" is neither a true lessor nor vendor, but a financier, is significant as a determinant that the agreement is for security. 1 R. Anderson, *Anderson on the Uniform Commercial Code* § 1–201:257 (3d ed. 1981). Thus, where a financier purchases the equipment as requested by the lessee and then leases the equipment to the lessee for a term of years under which the aggregate payments represent the purchase price plus interest, the lease is a secured transaction. *Courtwright Cattle Co. v. Dolsen Co.*, 94 Wash.2d 645, 619 P.2d 344, 349–50[4–6] (banc 1980).

That the economic reality of the transaction between CCEC and Parsons was that of a purchase of equity in goods and not a lease is confirmed by the fiscal implications of the agreement. CCEC purchased the tractor for $33,000, but the "rental" payments for the five year term of the "lease" amounted to $45,975.60, an excess over market value of more than 39%. Thus, the original five year term of the lease was at least equal to the economic life of the goods. In such a case, the lessor-financier is "simply a seller ... in lessor's clothing who has retained an interest to secure the buyer's promise to buy and pay the required installments on the purchase price." J. White & R. Summers, *Uniform Commercial Code,* § 22–3 (2d ed. 1980); *Lease Service Corp. v. American National Bank & Trust Co.*, 19 UCCRS 252, 259 (D.N.J.1976); *O.P.M. Leasing Services, Inc. v. Homestead Fabrics, Inc.* 18 UCCRS 1342, 1344 (N.Y.App.Div.1976).

The trial court properly determined that Article Nine governed the transaction, as well as the disposition of collateral concomitant of that secured transaction.

**B**

**Disposition of the Collateral**

■ A secured party has on default the right to take possession of the collateral. § 400.9–503. A secured party may after default sell or otherwise dispose of the collateral by public or private sale in a commercially reasonable manner "in every aspect ... including the method, manner, time, place and terms." § 400.9–504(3). The debtor is liable to the secured party for any deficiency that remains after the sale of the collateral. § 400.9–504(2). A debtor nevertheless has the right to recover from the secured party any loss caused by a disposition of the collateral in a manner not commercially reasonable. § 400.9–507.

The trial court found that the repossession of the collateral was justified but its disposition was not in a commercially reasonable manner. The court acknowledged the principle of § 400.9–507(2): "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." *See also Jefferson Bank & Trust Co. v. Horst*, 599 S.W.2d 201, 204 (Mo.App.1980). The court nevertheless determined that timely notice of sale to the debtor and regularity of the method, time and place of the private sale of the collateral notwithstanding, the price was not reasonable.

That conclusion of the commercial unreasonableness of the sale rests expressly on the opinions of Dudley Gillaspy, a John

Deere dealer, presented by Parsons as an expert. Gillaspy gave the opinion that the Parsons tractor had a fair market value of $27,000 when it was repossessed. That opinion rested on personal knowledge of the tractor as well as on the premise that a nearly new engine was added at a cost of more than $8000. It was an engine capable of more than 10,000 hours of service with only 3220 actual hours registered at the time of repossession. The expert described the tractor as "field-ready." The witness commented also that the appearance of a tractor "is a very important factor in resaling." Gillaspy considered the $6600 bid by Mid–South for the Parsons tractor as an interest in salvage and not for the purpose of resale.

The trial court noted the evidence that the windshield and rear glass of the tractor cab were broken out after repossession by CCEC and during its transport to the Selby Implement Company lot, and was on display for the bidders in that condition of disrepair. It was the "appearance of the tractor on the lot in this damaged condition," the court deduced, that explained the "low bidder interest and that the tractor was in fact a 'junker' or good only for salvage uses." That is to say, the determination that the disposition of the collateral was in a manner not commercially reasonable rests on that essential premise of fact. The court found, indeed, that it was not a reasonable expectation that the tractor, even without the impairment of the missing windows, would have sold for the fair market value at a repossession sale. That was because, as the findings explain, the tractor was not offered by a dealer but by the financier, and so was unattended by the usual representations of warranty or service. The invitation to bid as well as the advertisements made it clear that the tractor needed some repairs and was offered "as is."

The expert Gillaspy confirmed that the fair market value was the average resale value—the retail price that an authorized equipment dealer can obtain for the particular equipment. The bid of a dealer at a forced sale takes into account the cost to recondition the equipment, the cost of a warranty, of handling, and an expected profit. Factors, such as a rebuilt engine or the hours of usable service, are matters for inquiry and self-information. It was evident from that testimony that the "factor of appearance"—upon which the determination of the commercial unreasonableness of the sale of the tractor essentially rests—although of some consequence in fashioning the bid, was a very important factor in *resaling*. As the witness explained in response to the question as to whether absence of the front and back glass would "make a difference on its appearance: "And appearance, even though it doesn't make that mechanical difference, it is a very important factor in resaling something. A dealer—I couldn't, where I'm doing a resale to a customer, couldn't sell it that way."

There is no basis in the evidence for the finding of fact upon which the determination of commercial unreasonableness rests, that "the appearance of the tractor on the lot in this damaged condition," either explained the "low bidder interest" or indicated that "the tractor was in fact a 'junker' good only for salvage uses." The evidence from the expert was, rather, that the dealer bidders merely took the cost of that repair—along with other needed restorations—into account. There is no suggestion that the cost to reinstall the windows posed a difficult reckoning. It was the opinion of the expert, moreover, that the mechanical and functional idiosyncracies of the equipment were much more important to the bidder than mere eye-appeal. The expert acknowledged that his dealership had serviced the Parsons tractor and he was familiar with the machine. In addition to the expensive engine replacement, this particular tractor also had "some expensive clutch work and stuff" done to it. He questioned its reliability. "I don't think I would want to buy one; let's put it that way." He even commented: "If you spent that kind of money on it [to repair], it must be a real junker."

Nor does the evidence allow the cognate inference upon which the determination of commercial unreasonableness implicitly

rests—that the Parsons tractor was tendered as junk and bid for as junk. The invitation to bid was in the conventional form. The 1975 Steiger Tractor II was described by model and serial number, and could be seen at the Selby Implement Company. It informed that there were 3230 hours on the meter, and that the tractor "needs some repairs." It announced the sale of the tractor "as is, where is." There was nothing in the invitation to bid or in the advertisements to predispose the invitee to a bid for junk.

The more probable surmise is that those with a serious purpose to bid came to their tender by informing themselves of the "nitty-gritty" factors, the method described by Parsons' expert, Gillaspy. It is a reasonable inference that they, also, learned of the repair history of the Parsons tractor and also doubted its reliability as goods warrantable for retail sale. They, too, may have concluded that the tractor was a "real junker," and bid accordingly. There was evidence from Parsons himself that the tractor was not field-ready without repairs. That tends to explain the oddity [noticed by expert Gillaspy] that the dealer Selby, "who had actual possession of [the] tractor and had it available for inspection, would bid only $5100 on this tractor." There was relevant evidence [excluded by the court] in the condition report of the repossessed Parsons tractor furnished by Selby to CCEC that it would cost about $5178 to put the equipment in "salable condition." That tends to explain also why Parsons, who—as the court found—after his loan was approved and knew his tractor was on the Selby lot, nevertheless "took no action to regain possession of the tractor." Instead, "he purchased an identical tractor from Selby Implement Co., the very dealer who had picked up his tractor from his farm." The tractor purchased from Selby was of the same kind "with a serial number very close to his own" for $21,500. That he chose to pay several thousand dollars more than the deficiency owed for "an identical tractor," as the trial court found, is evidence of the unworthiness of the repossessed equipment even at a retail price of $18,791.37. The party who seeks a deficiency judgment bears the burden to prove compliance with the statutory requirements of the commercial reasonableness of the sale of the collateral. *First Missouri Bank & Trust Co. v. Newman*, 680 S.W.2d 767, 770–71[5] (Mo.App.1984). The commercial reasonableness of a sale is a question of fact. *Moutray v. Perry State Bank*, 748 S.W.2d 749, 752[3] (Mo.App. 1988). We determine that CCEC acquitted its burden of proof and that the finding by the trial court that the appearance of the tractor on the lot with windows missing explained the low bidder interest or indicated that the tractor was tendered as junk is without support in substantial evidence. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

■ A secured party who seeks a deficiency judgment, however, has the burden to prove every aspect of the disposition of collateral when commercial reasonableness is challenged. *First Missouri Bank & Trust Co. v. Newman*, 680 S.W.2d at 770–71; *American State Bank v. Hewson*, 411 N.W.2d 57, 61[7,8] (N.D.1987). The Code does not define *commercial reasonableness*, but gives the guide: "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." § 400.9–507(2); *Mann v. United Missouri Bank*, 689 S.W.2d 830, 832[5] (Mo.App.1985). That advisory nevertheless does not sanction unreasonably low prices. The generous provisions the statutes make for the disposition of the collateral were enacted, rather, "to encourage the secured party to seek the most advantageous resale price and thus reduce the possibility and amount of any deficiency." J. White & R. Summers, *Uniform Commercial Code* § 26–9 (2d ed. 1980).

■ The disparity between the $6600 sale price of the Parsons tractor and the $27,000 value assigned to the collateral by the expert opinion is evident. It is a factor important, but not decisive, to commercial reasonableness. The manifest contrast in-

vites scrutiny nevertheless to confirm that the secured party did not neglect the obligations of good faith, diligence, reasonableness and care. § 400.1–102(3). In the context of disposition of collateral, the duty to act in good faith is shown by evidence that the secured party was punctilious as to every procedure imposed by § 400.9–504(3) and was free of self-dealing. The diligent attention to the rights of the creditor at every stage of the disposition of the collateral, from declaration of default, through the notice of sale, the advertisements, the numbers of dealers invited to bid, the encouragement and responses to informal inquiries, all attest to a purpose to gain the best resale price and reduce any deficiency. *Villella Enterprises, Inc. v. Young*, 108 N.M. 33, 766 P.2d 293, 295[1, 2] (1988); *Leasing Service Corp. v. Diamond Timber, Inc.*, 559 F.Supp. 972, 979[12,13] (S.D.N.Y.1983), *aff'd*, 729 F.2d 1442 (2d Cir. 1983). The proof of good faith was met. *First Bank of South Dakota v. VonEye*, 425 N.W.2d 630, 637[11,12] (S.D.1988). *See also, Massey–Ferguson Credit Corp. v. Black*, 764 S.W.2d 137 (Mo.App.1989); *Mann v. United Missouri Bank*, 689 S.W.2d at 832[5]; *Jefferson Bank & Trust Co. v. Horst*, 599 S.W.2d at 204.

■ The trial court expressly found that the collateral was rightfully repossessed and we determine that there was no violation of any of the specific provisions of § 400.9–504(3) in its disposition. The damage to the tractor windows in the course of repossession impinged on neither. It was, at worst, the result of ordinary negligence, and not a disregard of normal commercial practices within § 400.9–504(3). It was damage taken into account by the bidders and reflected in the $6600 bid accepted by CCEC, and already found as commercially reasonable under the circumstances. A debtor nevertheless retains sufficient interest and rights with respect to the repossessed collateral to maintain an action against a third party who negligently damages the goods. *Isaac v. Gene's Used Cars*, 296 S.C. 280, 372 S.E.2d 102, 103[1,2] (S.C.App.1988).

## C
### Sufficiency of the Counterclaim

■ The trial court awarded Parsons $10,000 as a counterclaim against CCEC on the express premise that the disposition of the tractor was commercially unreasonable. And, indeed, § 400.9–507(1) grants a debtor the right to recover from the secured party any loss caused by an improper disposition of the collateral. The debtor also has resort to any common law remedy that may accrue. *Kouba v. East Joliet Bank*, 135 Ill.App.3d 264, 481 N.E.2d 325, 329[13] (1985); *see also* 9 R. Anderson, *Anderson on the Uniform Commercial Code* § 9–507:29 (3d ed.1985). The burden to prove the counterclaim is on the proponent.

■ The Parsons counterclaim rests on the premise that the disposition of the tractor was in a manner not commercially reasonable. It rests altogether on the remedy given by § 400.9–507. The evidence of damages consisted of Parsons' testimony. He claimed $4600 for attorney fees "to prepare for the case twice," a loss of "somewhere between fifteen to twenty thousand on the delay of crop," $10,000 by the sale of the collateral for $6600, another $10,000 for harassment by the banker. This was the total proof of the counterclaim. There was no independent claim for the damage done to the tractor windows. There is no authority for the recovery of attorney fees by a debtor in a suit under § 400.9–507. *See Robinson v. Mack Trucks, Inc.*, 426 N.W.2d 220 (Minn.App. 1988). The evidence of damages was otherwise completely speculative and without grounding other than the bare opinion of the witness. We sustain the CCEC contention that the counterclaim was not proven.

■ The judgment for Parsons on the counterclaim must be set aside for a more fundamental reason. The loss for which a debtor may recover under § 400.9–507 is for creditor misbehavior in the disposition of the collateral. We have adjudged that the trial court finding that CCEC acted in a commercially unreasonably manner is against the weight of the evidence. That necessary concomitant for suit under the

statute, therefore, is lacking, and the counterclaim must be dismissed.

The sanction to the debtor Parsons allowed by the trial court to set off his claim for common law or Code damages against CCEC's claim for a deficiency judgment, moreover, is a mode of relief our law does not recognize. When a secured creditor disposes of the collateral in a commercially unreasonable manner the question becomes whether the creditor may nevertheless have a deficiency judgment. The courts answer with three different dispositions: an absolute bar against a deficiency judgment, the rule of rebuttable presumption, and the rule of set-off.

■ The absolute bar rule peremptorily denies a deficiency judgment to a creditor who has disposed of the collateral in a commercially unreasonable manner. The UCC, however, does not mention the denial of a deficiency judgment among those remedies that § 400.9–507 codifies in favor of the debtor. *Wirth v. Heavey*, 508 S.W.2d 263, 268[9] (Mo.App.1974). Nor does the forfeiture by the creditor and the windfall to the debtor from the arbitrary denial of a deficiency judgment, however insignificant the infraction, subserve the equitable purposes of the Code. *Bank of Chapmanville v. Workman*, 406 S.E.2d 58, 64 (W.Va. 1991); *Standard Bank and Trust Co. v. Callaghan*, 177 Ill.App.3d 973, 127 Ill.Dec. 186, 532 N.E.2d 1015 (1988); *See* § 400.1–103 and J. White and R. Summers, *Uniform Commercial Code* § 26–8 (2d ed. 1980).

A strain of Missouri cases, nevertheless, adheres to the absolute bar rule with hardly more rationale than the rule itself. *See eg., Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860, 863[5] (Mo.App. 1978).

■ The rebuttable presumption rule indulges the presumption in the first instance that the collateral is worth at least the amount of the debt. It thereby shifts to the creditor the burden of proving the amount that should reasonably have been obtained through a sale conducted according to law. This rule is considered by the majority of courts to be the fairest and has

their concurrence. *Bank of Chapmanville v. Workman*, 406 S.E.2d at 64; *Henry v. Trickey*, 9 Ark.App. 47, 653 S.W.2d 138 (App.1983); *Farmers State Bank v. Thompson*, 372 N.W.2d 862 (N.D.1985); *Wang v. Wang*, 440 N.W.2d 740 (S.D.1989). It is the rationale adopted by this court in *Wirth v. Heavey*, 508 S.W.2d at 268.

■ The set-off rule allows a misbehaving creditor to collect a deficiency judgment, subject however to whatever damages are awarded to the debtor under section 400.9–507(1). The impediment of this rule is that the burden to prove damages rests on the debtor. *See* 9 R. Anderson, *Anderson on the Uniform Commercial Code* § 9–507:8 (3d ed.1985). It has no currency in our decisions. That is the rule that the trial court mistakenly applied.

## II

### Appeal of Counterclaimant Parsons

Parsons appeals on the ground that the finding of the trial judge that the disposition of the collateral was not commercially reasonable absolutely bars a deficiency judgment against the debtor. We have determined, contrary to that finding, that the sale of the collateral was commercially reasonable. The debtor Parsons therefore was not entitled to Code damages by any theory.

The judgment for deficiency against Parsons in the amount of $18,944.37 is affirmed. The judgment in favor of Parsons on the counterclaim in the amount of $10,-000 is reversed.

All concur.