638 A.2d 1225

Alexander F. RUDEN, et al.

v.

CITIZENS BANK AND TRUST COMPANY OF MARYLAND.

No. 967, Sept. Term, 1993.

Court of Special Appeals of Maryland.

April 1, 1994.

L. Dale Burgmeier (Burgmeier and Downer, on the brief), Annapolis, for appellants.

C. Edward Hartman, III (Hartman and Parrott, on the brief), Annapolis, for appellee.

Argued before MOYLAN, ALPERT and HARRELL, JJ.

MOYLAN, Judge.

The primary question confronting us on this appeal was succinctly posed by Note, *Creditor's Deficiency Judgment under Article 9 of the Uniform Commercial Code: Effect of*

*Lack of Notice and a Commercially Reasonable Sale,* 33 Md.L.Rev. 327 (1973):

> Upon default by a debtor in a security agreement, a secured creditor may, pursuant to Part 5 of Article 9 of the Uniform Commercial Code, repossess and dispose of the collateral in order to minimize the existing indebtedness. A problem, however, exists because, *while the Code requires the secured creditor* to notify the debtor of the disposition and *to conduct the disposition in a commercially reasonable manner, it fails to chart explicitly the consequences that befall the secured creditor should he not do so.* (footnotes omitted) (emphasis supplied).

Before addressing °that question, let us set it in context.

Citizens Bank and Trust Company of Maryland, appellee, filed a Complaint in the Circuit Court for Anne Arundel County against Alexander F. Ruden and Ann V. Ruden, appellants. The complaint alleged that the Rudens defaulted on their Consumer Loan Note and Security Agreement by failing to make monthly payments as promised and that they were liable for the deficiency remaining after the collateral was sold. The Rudens' answer and counterclaim alleged, in part, that the appellee's sale of the collateral was commercially unreasonable. The case was tried before a jury, presided over by Judge Martin A. Wolff. The jury rendered a verdict in favor of the appellee in the amount of $75,753.00.

On this appeal, the Rudens raise the following four issues:

I. Did the circuit court err in failing to instruct the jury that the appellee was barred from recovering a deficiency judgment if the boat was not sold in a commercially reasonable manner?

II. Did the circuit court err in failing to instruct the jury that the appellee was not entitled to a deficiency judgment if it purchased the boat at a private sale?

III. Did the circuit court err in failing to instruct the jury that the appellee was not entitled to a deficiency judgment if it sold the boat at a private sale?

IV. Did the circuit court abuse its discretion in failing to admit an appraisal of the boat as evidence of its value?

We find no error or abuse of discretion on the part of the circuit court, and, thus, we affirm.

*Facts*

The Rudens purchased a 35–foot Cheoy Lee sailboat in 1980 for $85,000. They financed $67,000 of the purchase price with People's Security Bank. In 1982, they leased the boat to James Morris. Morris kept the boat in a marina located on Hilton Head Island, South Carolina.

In 1984, the Rudens refinanced the boat with Citizens Bank and Trust Company of Maryland (Bank). The Rudens executed a Consumer Loan Note and Security Agreement in which they promised to pay to the order of the Bank the principal sum of $58,883.50 plus interest by making monthly payments. Morris was still leasing the boat from the Rudens at that time.

In February, 1985, Morris was two months behind in his payments. Additionally, the Rudens discovered that the boat was no longer located on Hilton Head Island, South Carolina. They became concerned. Subsequently, the boat was found in Miami, Florida. Morris's lease was terminated and the boat was seized by the U.S. Marshal in connection with a civil maritime action instituted by the Rudens in the United States District Court for the Southern District of Florida. Allied Marina, a marina located in Miami, Florida, acted as the substitute custodian for the boat.

The Rudens continued to make monthly payments to the Bank until August, 1986, when they could no longer do so. By a certified letter dated October 10, 1986, the Rudens were notified by the Bank that, because they had failed to make the required monthly payments, the boat would be repossessed on or after October 20, 1986 unless all defaults were cured by that date. In November, 1986, the Bank had the boat appraised, and it was valued at $45,000 by an appraiser.

Subsequently, the Rudens were informed by letter that the boat was repossessed on December 9, 1986 and that it contin-

ued to be stored at Allied Marina in Miami, Florida. The letter explained that they may redeem and retake possession of the boat during a 15–day period prior to its sale at public auction. At that time, however, the boat, apparently unbeknown by the Bank, was still in federal custody.

The Rudens were notified of the time, date, and location of the public sale and received copies of advertisements placed in *The Washington Post* and *The Miami Herald.* A public sale was held on January 27, 1987. The bidding opened at $35,000, but no bids were made. The Bank "bought" the boat for $35,000, but the sale was never consummated. Because the boat had been in federal custody when the Bank attempted to sell it at a public auction, the repossession and subsequent public sale were invalid.

After learning that the boat had been and was no longer in federal custody, the Bank officially notified the Rudens that the boat was being repossessed and that it intended to dispose of the boat. On March 16, 1987, the Rudens were informed by letter that the boat was being sold at private sale on or after April 1, 1987. The boat was sold to a third party for $12,-500.00 and the sale was consummated on July 8, 1987. By a letter dated July 16, 1987, the Bank notified the Rudens that their boat was sold on July 8, 1987 and that they were responsible for the deficiency balance. The sale price, however, was stated as being $35,000.

The Bank filed its Complaint in November, 1987 in the Circuit Court for Anne Arundel County. The case was tried before a jury on September 1, 2, and 3, 1992. The Bank requested that judgment in its favor be entered in the amount of $100,888.01, which included the deficiency, interest, and attorney's fees. The jury returned a verdict in favor of the Bank in the amount of $75,753.00. This appeal resulted.

*Creditor's Entitlement to a Deficiency Judgment*

### A. *Compliance With § 9–504(3): Deficiency Award Automatic*

When the sale is conducted with full compliance with the requirements of § 9–504(3), the sale price will be considered

to be the true value of the collateral and any deficiency will be awarded automatically to the creditor.[1]  Md.Code Ann., Com. Law § 9–504 (1992).  In terms of compliance with § 9–504(3), there was no issue in this case with respect to the giving of adequate notice.  The issue in dispute was the commercial reasonableness of the sale.  The circuit court instructed the jury, with regard to commercial reasonableness:

> In determining whether the sale was held in a commercially reasonable manner, for the purposes of a deficiency judgment, the burden of proof is on the Plaintiff, on the bank, who has brought suit.  The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not, of itself, sufficient to establish that the sale was not made in a commercially reasonable manner.  If the secured party either sells the collateral in the usual manner in any recognized market or if he sells at the price current in such market at the time of the sale, or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner.
>
> If you find the sale was held in a commercially reasonable manner and you have found that there is reasonable notification given to the Defendant, then you must return a verdict in favor of the Plaintiff against the Defendant.

Thus far, the judge's instruction was absolutely correct.

### B.  Noncompliance:  What Is the Sanction?

At that point, the trial judge went on to instruct the jury as to what it should have done in case it found the sale to have been commercially unreasonable.  As to any damages that might have resulted from the failure of the Bank to conduct

---

1.  If, on the other hand, there is a surplus beyond the amount necessary to satisfy the debt and the reasonable expenses of repossessing and disposing of the collateral, the creditor must account to the debtor for such surplus.

the sale of the boat in a commercially reasonable manner, the judge advised:

> If you find that the sale was not held in a commercially reasonable manner, your job is not finished because you must determine to what extent the Defendant has been damaged by the failure to hold the sale in a commercially reasonable manner.
>
> To determine the effect of a sale which was not held in a commercially reasonable manner, you must determine from the evidence presented what sale price would have resulted from a commercially reasonable sale.... *If the price which would have been obtained at a commercially reasonable sale is higher than that which was actually obtained, you must subtract the difference from the Plaintiff's demand and return a verdict in favor of the Plaintiff in the reduced amount.* (emphasis added).

Initially, a word is in order as to why the Rudens' contention with respect to this second jury instruction is not moot. No special issues were submitted to the jury for resolution and it is impossible to deduce just how it arrived at its verdict for the Bank in the amount of $75,753. Arithmetically, there is no way to manipulate the figures to come up with that sum (or remainder or product or quotient, as the case may have been). Recognizing that the final verdict may have been the result of compromise, compounded perhaps by a few arithmetic miscalculations, we can only base our possible deductions on rough and rounded figures.

One possibility, of course, is that the jury found as a fact that the Bank's sale of the boat was commercially reasonable but also concluded, by way of some compromise or some generous impulse toward the Rudens, not to "stick" the Rudens with the Bank's attorney's fees. If the jury, indeed, found that the sale was commercially reasonable, then the present contention about appropriate sanctions for a commercially unreasonable sale is mooted.

That enigmatic jury verdict, however, is also vulnerable to another interpretation. The verdict may just as plausibly

have been that the sale was commercially unreasonable and that the Bank was not, therefore, entitled to the full difference between the actual sale price of $12,500 and the total debt of $100,888 (a deficiency of just over $88,000) but was only entitled to the difference between the fair market value of the boat and the total debt. In terms of what that possibly larger subtrahend (fair market value) might be, the Bank, of course, was arguing that the fair market value was, indeed, the actual sale price of $12,500. and no more. There was evidence, on the other hand, more favorable to the Rudens, of an appraisal and a fair market value in the neighborhood of $35,000. There is always the possibility that the jury essentially split the difference between the lesser figure and the greater figure and found a fair market value of approximately $25,000. That would explain how a debt of just over $100,000 minus a fair market value of $25,000 would have yielded a deficiency verdict of just over $75,000. It is because this latter possibility is very real and plausible as an explanation for what the jury did that the instruction on the subject of sanctions may have been critical to the outcome of this case and is, therefore, properly before us.

The Rudens contend that the circuit court's instruction as to damages that may result from the Bank's failure to conduct the sale in a commercially reasonable manner was in error. They argue that failure to meet the requirement of a commercially reasonable sale under § 9–504(3) totally bars the recovery of a deficiency judgment in any amount and, therefore, the circuit court's instruction was in error. We disagree.

Section 9–504(3) states that:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market *reasonable notification* of the time after

which any private sale or other intended disposition is to be made *shall be sent by the secured party to the debtor, and* except in the case of consumer goods *to any other person who has a security interest in the collateral* and who has duly filed a financing statement indexed in the name of the debtor in this State or who is known by the secured party to have a security interest in the collateral.  The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely .distributed standard price quotations he may buy at private sale.  (emphasis supplied).

It is clear that § 9–504(3) requires both 1) that the sale of the collateral be conducted in a commercially reasonable manner and 2) that reasonable notice be given to the debtor. Section 9–504 does not, however, explicitly address the consequences of a secured party's failure to meet either of those requirements.

### C.  Sanction # 1:  Deficiency Judgment Absolutely Barred

Courts across the country have approached the problem in essentially three different ways.  Some jurisdictions absolutely bar a secured party's recovery of any deficiency judgment for failure to comply with the requirements of § 9–504.  They do so regardless of whether the noncompliance was the failure to give notice or the failure to conduct the sale in a commercially reasonable manner.  The rationale invigorating that position was well articulated by *Leasco Data Processing Equip. Corp. v. Atlas Shirt Co.*, 66 Misc.2d 1089, 323 N.Y.S.2d 13, 16 (N.Y.City Civ.Ct.1971):

It surely has meaning that the very section [9–504] that affirms the right to a deficiency judgment after sale of a repossessed article also describes in simple and practical terms the rules governing dispositions as well as the pertinent notice requirements.  If a secured creditor's right to a deficiency judgment were intended to be independent of compliance with those rules, one would surely expect that unusual concept to be delineated with clarity.  The natural inference that the right depends upon compliance is force-

fully underlined by the joining of the two provisions in one section.

*See also Atlas Thrift Co. v. Horan,* 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 321 (1972).

### D. Sanction # 2: Burden on Debtor to Qualify for Set–Off

A second approach traditionally allowed the secured creditor to recover a deficiency judgment notwithstanding noncompliance with § 9–504(3), subject only to a reduction or set-off for damages suffered by the debtor. That approach has been described by 2 James J. White & Robert S. Summers, *Uniform Commercial Code,* § 27–19, at 630–631 (3d ed. 1988):

> [Another] line of cases allows the secured creditor to recover the deficiency subject only to reduction for any damages suffered by the debtor. For example, in *Abbott Motors, Inc. v. Ralston,* [28 Mass.App.Dec. 35, 5 UCC 788 (1964) ], the court said that violation of the provisions of Part Five did not excuse the debtor from paying a deficiency, but that he was entitled to a set-off for any loss suffered as a result of it. (Presumably, the damages would be the difference between the fair market value of the collateral established by the debtor and the actual resale price.) In a later Pennsylvania case, *Mercantile Financial Corp. v. Miller,* [292 F.Supp. 797 (E.D.Pa.1968) ], another federal district court in that state (ignoring the *Skeels* [*v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696 (D.C.Pa.1963) ] case) determined that, because the secured party made a commercially unreasonable sale, the debtor was entitled to have a default judgment reopened. But the court did not deny recovery of the deficiency. It said that the sole purpose for reopening the judgment was to establish the fair market value of the collateral. The Court further stated that the burden of proving the fair market value fell upon the *debtor* :
>
> > Moreover, in order to have the judgment altered in his favor, Miller [debtor] still must establish by a preponderance of the evidence what the fair market value of these assets was on the date of sale. By granting Miller's

motion we do not suggest that he in fact is entitled to any greater credit arising from the disposition of this collateral than he had already received. [292 F.Supp. at 801]

Under that second approach, the creditor did not automatically suffer any sanction at all for his noncompliance. The full burden was placed on the debtor to establish the fair market value of the collateral. Only when he had done so was he then entitled to a set-off for the difference between the sale price actually realized and the fair market value of the collateral, to wit, the price it should have brought if it had been sold in a commercially reasonable way. That difference would be used, as a set-off, to reduce the amount of the deficiency.

In fashioning an appropriate sanction, courts were initially faced with that starkly bipolar choice between two extremes. On the one hand, noncompliance would absolutely bar a creditor from any deficiency judgment, no matter how relatively minor the impact of the noncompliance and no matter how unduly harsh the total bar to a deficiency might be. On the other hand, the only apparent alternative inflicted virtually no penalty whatever on the creditor for noncompliance but, rather, allocated to the debtor the burden of establishing the prejudice that he may have suffered from such noncompliance. 2 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 27–19, at 631 (3d ed. 1988) described this dichotomy:

On one end of the scale, *Skeels* in Pennsylvania and now [*First State Bank of Morrilton v.*] *Hallett* [291 Ark. 37, 722 S.W.2d 555 (1987) ] in Arkansas stand clearly and unequivocally for the proposition that a creditor who violates the provisions of Part Five of Article Nine loses his right to a deficiency. At the other extreme, some states expressly allow the creditor a deficiency judgment, subject to set-off for whatever loss the *debtor* can prove as a result of the improper sale.

In rejecting both extremes, the Supreme Court of Appeals of West Virginia, in *Bank of Chapmanville v. Workman,* 185 W.Va. 161, 406 S.E.2d 58 (1991), focused its critical gaze

initially on the "absolute bar" approach, observing, 406 S.E.2d at 64:

> Under the "absolute bar" rule, any secured creditor who is found to have disposed of the collateral in a commercially unreasonable manner is absolutely barred from seeking a deficiency judgment. There are several problems with this rule. First, it is a judge-made punitive provision. . . .
>
>     .        .        .        .        .
>
> Second, there is absolutely no support in the wording of the UCC for the "absolute bar" rule. Third, the "absolute bar" rule involves a forfeiture, and the law generally disfavors forfeitures. Fourth, the amount of the penalty bears no relation to the degree of commercial unreasonableness of the secured creditor's conduct, but depends solely upon the amount of the deficiency. That is, a creditor who is owed a deficiency of one million dollars can be penalized more for *slightly* commercially unreasonable conduct than a thoroughly abusive creditor who is left with a deficiency of one hundred dollars. (emphasis in original).

It then turned its analytic scrutiny on the opposite extreme, the "set-off" rule, observing, 406 S.E.2d at 64–65:

> At the other extreme, under the "set-off" rule, the creditor collects a deficiency judgment, subject only to whatever statutory damages are awarded to the debtor on a counterclaim under UCC 9–507(1) . . . The main problem with this rule is that the debtor has the burden of proving his losses under UCC 9–507, and will usually have a hard time proving that the fair market value was higher than what the collateral actually sold for at the repossession sale. In many cases, the secured creditor's commercially unreasonable behavior (*e.g.*, lack of adequate notice to the debtor) will have greatly hindered the debtor's ability to prove his damages. (citation omitted).

### E.  Sanction # 3:  The Middle Position

More recently, a middle position has emerged which has softened the harsh bipolarity of the earlier choice. In *Bank of Chapmanville v. Workman,* it is not surprising that West

Virginia, after roundly criticizing the two extremes, as noted above, opted for the third, newer, and middle position:

> Courts around the country have chosen from among the following three rules: (1) the "absolute bar" rule; (2) the "set-off" rule; and (3) the "rebuttable presumption" rule. The "rebuttable presumption" rule appears to have become the majority rule, and is the soundest of the three. (footnote omitted).

406 S.E.2d at 64.

This tripartite breakdown of the possible results that might follow a creditor's noncompliance with the requirements of § 9–504(3) has also been well summarized by Robert S. Minetz, *May a "Wrongdoer" Recover a Deficiency Judgment, or Is Section 9–507(1) a Debtor's Exclusive Remedy?*, 6 UCC L.J. 344, 345–346 (1974):

> The cases which have considered whether a secured party who has failed to comply with the UCC repossession and resale provisions has forfeited his right to deficiency judgment have taken three routes. One line of cases has held that the wrongdoing by the secured party precludes his right to a deficiency. Another group of courts has simply referred to the damaged debtor to 9–507(1) for a remedy. The third line of authorities has allowed the action for the deficiency but has imposed a presumption that the actual value of the collateral at the time of the wrongful sale is equal to the balance due to the secured party. Thus, no deficiency is owned to the creditor unless the presumption is rebutted. The three groups of cases will be considered in turn.

After twenty years of adherence to the "absolute bar" position, the Supreme Court of Georgia, in *Emmons v. Burkett*, 256 Ga. 855, 353 S.E.2d 908 (1987), abandoned the "absolute bar" rule in favor of what has come to be called the "rebuttable presumption" rule. As 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 27–19, at 627 (3d ed. 1988) has explained, "According to this rule, the creditor who fails to give notice or conducts a commercially unreasonable sale can still recover a deficiency if he rebuts the

presumption that the value of the collateral was equal to the debt." *Emmons v. Burkett,* 353 S.E.2d at 911, held that:

> ... the rebuttable-presumption rule, by placing the burden on the creditor to show the propriety of the sale and making him liable under [9-507] for any injury to the debtor, provides an adequate deterrent to an improper sale on the part of a creditor, and adequately protects the debtor's interest, without arbitrarily penalizing the creditor.

The decided trend, nationwide, is toward the "rebuttable presumption" rule as state after state has rallied under that banner. In *Kobuk Eng. v. Superior Tank & Constr. Co.,* 568 P.2d 1007 (Alaska 1977), the Supreme Court of Alaska held that the sale of a collateral by a creditor in that case "was not commercially reasonable." 568 P.2d at 1013. Turning then to the question of what consequences should flow from that commercially unreasonable sale, Alaska rejected the "absolute bar" approach as "repugnant to the spirit of the UCC." *Id.* It opted, instead, for the "rebuttable presumption" rule:

> We hold that the commercially unreasonable sale made by Superior acts to decrease the amount of the deficiency judgment which Superior is entitled to recover from Kobuk. The fair and reasonable value of the collateral at the time of repossession should be offset against the balance due on the security agreement. Where the collateral has been sold in a sale that does not comply with the provisions of the UCC, there is a rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt. In order to overcome that presumption, the secured party has the burden of either (1) obtaining a fair and reasonable appraisal at or near the time of repossession, or (2) producing convincing evidence of the value of the collateral. In order to meet the latter burden, the secured creditor is required to bring forward proof of the condition of the collateral and the usual price of items of like condition. (footnotes omitted).

568 P.2d at 1013–1014.

A similar policy choice was faced by the Supreme Court of New Mexico in *Clark Leasing Corp. v. White Sands Forest*

*Prod.,* 87 N.M. 451, 535 P.2d 1077 (1975). The court there acknowledged that the case before it "squarely raises, for the first time in New Mexico, the question whether or not a secured creditor is absolutely precluded from recovering a deficiency judgment under the UCC if he fails to dispose of repossessed collateral as required under § 9–504(3)." 87 N.M. at 455, 535 P.2d at 1081. In rejecting the "absolute bar" approach and opting, instead, for the "rebuttable presumption" rule, the New Mexico Supreme Court held, 87 N.M. at 455–456, 535 P.2d at 1081–1082:

> We consider this rule [the "absolute bar" rule] repugnant to the spirit of the UCC. The complete denial of a deficiency smacks of the punitive and is directly contrary to Article Nine's underlying theme of commercial reasonableness. "If the secured party has reimbursed the debtor for any losses incurred by improper sale, he has approximated the commercially reasonable sale. Thus, he should be allowed to receive the money which would have been due if the sale had been commercially reasonable." Minetz, "May a 'Wrongdoer' Recover a Deficiency Judgment, or is Section 9–507(1) a Debtors Exclusive Remedy?", 6 UCC L.J. 344 at 363 (1974).
>
> We agree with those courts that hold a secured party's failure to comply with § 9–504(3) does not result in a forfeiture of the right to a deficiency.

It further stated its belief that "simple considerations of fair play mandate the adoption of this rule for New Mexico." 87 N.M. at 456, 535 P.2d at 1082. *See Carter v. Ryburn Ford Sales, Inc.,* 248 Ark. 236, 451 S.W.2d 199 (1970); *Assoc. Fin. Serv. Co. v. DiMarco,* 383 A.2d 296 (Del.Super.Ct.1978); *Bank of Oklahoma, N.A. v. Little Judy Indus.,* 387 So.2d 1002 (Fla.Dist.Ct.App.1980); *Mack Fin. Corp. v. Scott,* 100 Idaho 889, 606 P.2d 993 (1980); *Wirth v. Heavey,* 508 S.W.2d 263 (Mo.Ct.App.1974); *Levers v. Rio King Land & Inv. Co.,* 93 Nev. 95, 560 P.2d 917 (1977); *Franklin State Bank v. Parker,* 136 N.J.Super. 476, 346 A.2d 632 (Union County Ct.1975); *Security Trust Co. of Rochester v. Thomas,* 59 A.D.2d 242, 399 N.Y.S.2d 511 (1977); *Hodges v. Norton,* 29 N.C.App. 193, 223

S.E.2d 848 (1976); *State Bank of Towner v. Hansen*, 302 N.W.2d 760 (N.D.1981); *Assoc. Capital Serv. Corp. v. Riccardi*, 122 R.I. 434, 408 A.2d 930 (1979); *Investors Acceptance Co. of Livingston v. James Talcott, Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130 (1969); *Aetna Fin. Co. v. Ables*, 559 S.W.2d 139 (Tex.Civ.App.1977). *See also* Richard C. Tinney, Annotation, *Failure of Secured Party to Make "Commercially Reasonable" Disposition of Collateral Under UCC § 9–504(3) as Bar to Deficiency*, 10 A.L.R. 4th 413, 422–430 (1981).

The operation of the "rebuttable presumption" rule was well explained in Note, *Creditors Deficiency Judgment under Article 9 of the Uniform Commercial Code: Effect of Lack of Notice and A Commercially Reasonable Sale*, 33 Md.L.Rev. 327, 342–343 (1973):

> [I]f the creditor has failed either to give notice or to conduct a commercially reasonable sale, he should have the burden of proof to show that he did not prejudice the debtor's rights and that the sale resulted in a fair and reasonable price for the collateral, because the proof incident to notice and resale are peculiarly within the creditor's knowledge. If the secured creditor cannot prove that the sale reflected the fair and reasonable value of the collateral, most courts will presume that the value of the collateral sold without notice and without a commercially reasonable resale is equal to the amount of the debt. Often though, the secured creditor will be able to rebut this presumption and prove a reasonable value that will accord him a deficiency. (footnotes omitted).

West Virginia has similarly explained the manner in which the middle approach operates:

> For the victim of a commercially unreasonable disposition of collateral, the "rebuttable presumption" rule comes to the rescue. Under this rule, the fair market value of the collateral is rebuttably presumed to equal the amount of the remaining debt. To recover a deficiency, the secured creditor who is found to have disposed improperly of the debtor's

collateral must prove that the debt exceeded the fair market value of the collateral.

*Bank of Chapmanville v. Workman,* 406 S.E.2d at 65.

The New Mexico Supreme Court handles the "rebuttable presumption" rule in precisely the same way:

> Under these decisions, where the value of the collateral is at issue, there is a presumption that the value of the repossessed collateral at resale is equal to the value of the outstanding debt. Where the sale is conducted in accordance with § 9–504(3) the sum received at sale is evidence of the market value. But if the sale is not conducted according to the Code, the amount received is not evidence of the market value of the collateral. The secured party has the burden of proving the market value by other evidence. (citations omitted).

*Clark Leasing Corp. v. White Sands Forest Prod.,* 87 N.M. at 456, 535 P.2d at 1082.

### F. The Maryland Case Law: Failure of Notice

■ Before we may proceed to make a policy choice, of course, we must determine what freedom of movement is permitted us by *stare decisis*. On two occasions, the Court of Appeals has squarely held that the failure of a creditor to comply with the provisions of § 9–504(3) will operate as an absolute bar to the creditor's recovery of a deficiency judgment. *First Nat'l Bank v. DiDomenico,* 302 Md. 290, 487 A.2d 646 (1985); *Maryland Nat'l Bank v. Wathen,* 288 Md. 119, 414 A.2d 1261 (1980).

At first glance, that appears to be dispositive. On closer examination, however, the two Maryland decisions involve a creditor's failure to notify the debtor of the impending sale of the collateral after default and repossession. The rationale for both of the holdings, moreover, is based primarily on the preclusion of the debtor's right of redemption under § 9–506.

As the analysis of this provision of the Uniform Commercial Code has become more sophisticated, however, there is a growing awareness of the qualitative difference between 1) the

failure to give the debtor any notice of the sale and 2) other instances of operating in a commercially unreasonable fashion. Illustrative of this emerging sophistication is the decision of the Supreme Court of Kentucky of *Holt v. Peoples Bank of Mt. Washington*, 814 S.W.2d 568 (Ky.1991). Even more so than in Maryland, a significant body of Kentucky precedent had indicated that failure of compliance with the *verbatim* Kentucky counterpart of § 9–504(3) would result in an absolute bar to a deficiency judgment. In the *Holt* case, however, the Supreme Court of Kentucky noted, as we note here, that all of the earlier failures of compliance had been of the failure-to-give-notice variety. It then recognized, as do we, the distinction:

> At the outset, a distinction should be made between the failure to give presale notice of the intended disposition of collateral and other acts of commercially unreasonable behavior. Notice to the debtor that the collateral is about to be disposed of is so fundamental that no remedy less severe than forfeiture of the deficiency amount would be adequate and this remedy is by no means exclusive. In a proper case, criminal and tort liability may be imposed....

814 S.W.2d at 570.

The Kentucky Supreme Court explained why the failure of a creditor to give notice to the debtor logically incurred the heavy sanction of foreclosing any deficiency judgment:

> A secured party who fails to give the notice ... denies the debtor an opportunity to assert defenses, contest the amount claimed or pay the indebtedness prior to sale of the collateral. The greatest protection available to debtors from unscrupulous conduct by secured parties who have repossessed collateral is notice of disposition of the collateral. When notice is omitted, the principle of estoppel heretofore recognized by the courts of this Commonwealth prevents recovery of any deficiency judgment. *Skeels v. Universal C.I.T. Credit Corporation*, 222 F.Supp. 696 (W.D.Pa. 1963).

814 S.W.2d at 571. In its analysis of the gravity of the failure to give notice, Kentucky relied upon the same landmark case of *Skeels v. Universal C.I.T. Credit Corp.*, 222 F.Supp. 696 (W.D.Pa.1963), that the two Maryland decisions also relied heavily upon.

Even a quick perusal of *Maryland Nat'l Bank v. Wathen*, 288 Md. 119, 414 A.2d 1261 (1980), reveals unmistakably that its exclusive concentration was on the failure to give notice specifically and not on noncompliance with § 9–504(3) generally. At the very outset of the opinion, Judge Cole stated the issue:

> In this case we are asked to decide whether a secured party, who, after default by the debtors, repossesses the collateral and conducts the sale thereof, is barred from suing for a deficiency *because he failed to notify* the debtor of the sale. (emphasis supplied).

288 Md. at 120, 414 A.2d 1261. Within a page, the Court of Appeals stated the appellant's contention, "The Bank, while conceding that John was a debtor *entitled to notice*, contends that its *failure to notify* John was an oversight." (emphasis supplied). *Id.* at 121, 414 A.2d 1261. In surveying the law around the country, the Court focused again on the failure to give notice: "For courts which impose an absolute bar *when notice is not sent, see Skeels v. Universal C.I.T. Credit Corp.*, 222 F.Supp. 696 (W.D.Pa.1963), *modified on other grounds* 335 F.2d 846 (3d Civ.1964)." (emphasis supplied). *Maryland Nat'l Bank v. Wathen*, 288 Md. at 121 n. 1, 414 A.2d 1261. The Court of Appeals further noted that the mere fact that the sale is commercially reasonable in other regards does not adequately atone for the failure to give notice:

> We conclude then that § 9–504(3) requires *reasonable notification* of the time and place of any proposed sale and further that the requirement that the sale be commercially reasonable does not afford the debtor sufficient assurance that full value will be given for the collateral. (emphasis supplied).

288 Md. at 122, 414 A.2d 1261. The heart of the analysis by the Court of Appeals went to the extreme prejudice to the rights of a debtor incurred by his failure to receive notice. The analysis paralleled precisely that of *Skeels v. Universal C.I.T. Credit Corp.* and of the Kentucky Supreme Court in *Holt.* The Court of Appeals reasoned, 288 Md. at 122–123, 414 A.2d 1261:

> Our conclusion is undergirded by the interrelation of the provisions of the code which were apparently drafted so that the debtor is afforded a reasonable opportunity to protect his interests. Section 9–506 of the U.C.C. expressly bestows upon the debtor the opportunity to redeem the collateral by tendering payment of the balance due. It is manifest that *the debtor without notice of the sale can be effectively prevented from exercising his right to redemption.* Furthermore even if the debtor is not in a position to redeem, *if he has notice, he may still be able to refinance* and must therefore be capable of arranging for potential creditors to inspect the collateral. Alternatively, *a debtor with notice may be able to procure interested buyers* to drive up the level of competitive bidding. At the very least, *notice provides the opportunity to attend the sale* to insure that it is commercially reasonable. *To permit recovery of a deficiency judgment absent notice would effectively nullify these important debtor's rights* and permit "a continuation of the evil which the Commercial Code sought to correct. . . . It was the secret disposition of collateral by chattel mortgage owners and others which . . . the Code sought to correct." *Skeels v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696 (W.D.Pa.1963), *modified on other grounds,* 335 F.2d 846 (3d Cir.1964). We see no need to undermine the protection which these provisions were intended to afford. (emphasis supplied).

The Court, in *Wathen,* went on to weigh the heavy prejudice to a debtor denied notice against the ease with which the creditor may satisfy the notice requirement:

> Our conclusion is reinforced by the juxtaposition of the interests of the debtor with *the ease with which the secured*

*party may comply with the notice requirements.* Section 9–504(3) requires *only reasonable notification;* there is *not even the requirement that such notification be in writing* particularly where the debtor has actual knowledge of the proposed sale. All the creditor need do to protect his own interests is obey the uncomplicated mandate of the law— *send reasonable notice.* (citation omitted) (emphasis supplied).

288 Md. at 123–124, 414 A.2d 1261. The final holding of the Court unmistakably concerned itself with the sanction that would necessarily follow from a failure to give notice:

While we have not before addressed *the requirement of notice* in a factual context similar to this case, we have in our prior decisions regarding *the required notice in other types of sales* indicated an abiding concern for its strict observance. We now underscore our concern by holding that *compliance with the notice provision* of § 9–504(3) *is a condition precedent* to recovery of a deficiency judgment. (citations omitted) (emphasis supplied).

288 Md. at 126, 414 A.2d 1261.

The focus in *First Nat'l Bank of Maryland v. DiDomenico,* 302 Md. 290, 487 A.2d 646 (1985), was as exclusively on the single subject of notice as had been the focus in *Wathen.* At the very outset of the opinion, the Court signaled what the decision would be: "We shall hold that *the notice was not a reasonable one.* " (emphasis supplied). As it began its analysis, the Court pointed out that § 9–504(3) "governs *with respect to notice* from the creditor to the debtor." (emphasis supplied) 302 Md. at 294, 487 A.2d 646. It then went on to quote, in pertinent part, that portion of § 9–504(3) dealing with the notice requirement but deleting any reference to any other requirement. In the course of its analysis, the Court summarized its holding in *Wathen:*

*In Maryland Nat'l Bank v. Wathen, 288 Md. 119, 414 A.2d 1261 (1980), this Court addressed the effect of noncompliance with the notice requirements of § 9–504(3) on a deficiency judgment.* There the secured creditor had total-

ly *failed to give notice* of a sale of the collateral to one of several debtors. *Wathen* held that a deficiency judgment was barred as to that debtor and *described reasonable notice as a condition to a deficiency judgment.* (emphasis supplied).

302 Md. at 296, 487 A.2d 646. *DiDomenico* further characterized *Wathen* as holding that a failure to give notice would *ipso facto* bar any deficiency judgment, notwithstanding the fact that the sale was nonetheless commercially reasonable:

> The *Wathen* holding is that *the giving of reasonable notification is a condition precedent to a deficiency judgment.* *Wathen* assumed that the public auction of the collateral there involved had been commercially reasonable and its holding did not depend on causally connecting loss to *the lack of notice.* (emphasis supplied).

302 Md. at 297, 487 A.2d 646.

*Wathen* and *DiDomenico* establish unmistakably that in Maryland the failure of a creditor to comply with the notice requirement of § 9–504(3) will operate as an absolute bar to the obtaining of any deficiency judgment against the debtor. Beyond that, however, the field is yet unplowed. In neither *Wathen* nor *DiDomenico* did the Court of Appeals give any thought (it was not called upon to give any thought) to the appropriate sanction in the case of a creditor's noncompliance with any provision of § 9–504(3) other than the notice requirement.

### G. The Maryland Law: Commercial Unreasonableness

■ That rationale of *Wathen* and *DiDomenico,* whatever its force in the no-notice context, does not necessarily support totally barring the recovery of a deficiency judgment in the different context of a secured party's failure to conduct the sale of the debtor's collateral in a commercially reasonable manner. As result of a secured party's conduct in that regard, the debtor may still, of course, be damaged. That damage, however, can be quantified in monetary terms. Equity does not logically require, therefore, that the debtor be

completely relieved of total responsibility for any deficiency, as he would be in the case of non-notice. Thus, we reject the Rudens' argument that a secured party should be totally barred from recovering any deficiency judgment if its conduct as to the sale of the collateral is found to be commercially unreasonable.

Once again, the Supreme Court of Kentucky in *Holt v. Peoples Bank of Mt. Washington,* 814 S.W.2d 568 (Ky.1991), provides guidance. After reaffirming its commitment to the "absolute bar" rule for violations of the notice requirement, it rejected that absolute foreclosure as a sanction for other varieties of commercial unreasonableness:

> We now turn to the myriad of other circumstances in which the finding of commercial unreasonableness is based on some defect other than a failure to give notice. Three possible remedial formulas are described in D. Leibson and R. Nowka, *The Uniform Commercial Code of Kentucky,* § 8.6(G)(2) (1983). Having heretofore reaffirmed our reliance on the first of these when the defect is lack of notice but rejected it in other circumstances, the first approach need not be discussed further.

814 S.W.2d at 571.

There are, moreover, intimations in (if not intimations in, at least emanations from) the Maryland case of *Harris v. Bower,* 266 Md. 579, 295 A.2d 870 (1972), decidedly pointing in the same direction. Attempting to decipher *Harris* is, to be sure, an exercise not unlike attempting to decode Nordic runes or Egyptian hieroglyphics because its unusual procedural posture puts a reverse spin on every issue. The cryptographic effort, however, is worth making.

Donald W. Bower (Bower) was the creditor. The debtor was Anna M. Harris (Harris).[2] In 1964, the creditor, Bower,

---

2. Actually, the original debtor was John S. Harris. He died after the chattel in question had been purchased by him but before the litigation began. His interests were assumed by his widow, Anna M. Harris. For communicative simplicity, however, it suffices to refer to the debtor simply as "Harris."

sold a boat to the debtor, Harris, for $17,000. To guarantee payment of the debt, the debtor gave the creditor a chattel mortgage on the boat. Bower thereby became a secured creditor within the contemplation of the Uniform Commercial Code. The debtor, Harris, defaulted in her payments in the summer of 1969. In December, 1969, Bower obtained a summary judgment against Harris in the amount of $21,-738.25. Bower repossessed the boat on March 30, 1970. There was uncontroverted evidence that at the time of the repossession, the boat had a value of $13,900 on the open market. Three clumsy and ultimately abortive efforts on the part of the creditor to sell the boat in January, 1970, produced an offer of no higher than $4,500. Under the circumstances, the repossessing creditor did not sell the boat.

It was at that point that the provisions of §§ 9–504, 9–505, and 9–507 first came into play. The first "reverse spin" was that the creditor, at the time the case ultimately came to court, had not sold the boat to obtain full or partial satisfaction of his judgment but was still retaining it. The second "reverse spin" is that it was not the creditor who brought suit, seeking a deficiency judgment for the difference between the then-present value of the boat (sold or retained) and the amount of the debt. It was the debtor, rather, who brought suit, seeking an accounting. Basically, she was seeking a declaration that the retention of the collateral by the creditor operated as a complete satisfaction of her, the debtor's, obligation to the creditor.

The primary thrust of the debtor's case, at trial and on appeal, was that the creditor, by retaining the boat, had engaged the gears of § 9–505(2) which provides that "a secured party in possession *may*, after default, *propose to retain* the collateral in satisfaction of the obligation." (emphasis supplied). The Court of Appeals held that the creditor, Bower, had not brought down upon his head the full fury of the "satisfaction of the obligation" consequences of § 9–505(2). He had never "propose[d] to retain the collateral in satisfaction of the obligation." It was not his intention to do so. It was not in his interest to do so. He had simply remained

"stuck with the boat" because of his inability to obtain a satisfactory sale price. Notwithstanding the fact that the boat was still in his possession, there was a critical difference between wishing and proposing to retain it, on the one hand, and being stuck with it, on the other hand. The provisions of § 9–505(2) were thus eliminated from the equation.

In rejecting the debtor's argument with respect to § 9–505(2), the Court of Appeals made it clear that the creditor's actions in repossessing and then in retaining the boat had not operated to extinguish the entire debt owing to him from the debtor:

> It must be assumed that he [the creditor] rejected [the debtor's] proposal and it seems clear to us that he anticipated the recovery from the appellant of the full amount of the judgment. The estate of Harris is insolvent but it is fair to assume that appellant is not judgment-proof. While we think Bower has come perilously close to painting himself into a corner in this regard *we are unwilling,* in these circumstances, *to hold that what he has done extinguishes the entire debt.* (emphasis supplied).

266 Md. at 587–588, 295 A.2d 870.

At that point, the opinion in *Harris v. Bower* becomes a bit murky. It blends into a single discussion the provisions of § 9–504(3), dealing with the requirements that a creditor sell a chattel in a commercially reasonable way in order to be entitled to a full award for any resulting deficiency, and the provisions of § 9–507, dealing with the entitlement of an agreed debtor to recover for any losses incurred by the failure of the creditor to act in a commercially reasonable way. Although the suits may be coming from different directions in § 9–504 and in § 9–507, both provisions discuss, in completely compatible terms, what it is that makes a sale commercially reasonable. Section 9–507(2), however, includes the following interesting statement:

> The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of dispositions.

After quoting that provision, the *Harris v. Bower* opinion turned to "an excerpt from paragraph 6 of the 'Official Comment' under § 9–504":

> See Section 9–507(2). Under that provision a secured party who without proceeding under Section 9–505(2) held collateral a long time without disposing of it, thus running up large storage charges against the debtor, where no reason existed for not making a prompt sale, might well be found not to have acted in a "commercially reasonable" manner. See also Section 1–203 on the general obligation of good faith.

266 Md. at 589, 295 A.2d 870.

What the *Harris v. Bower* opinion seemed to do was to make the unnecessarily long retention of the collateral because of a commercially unreasonable failure to sell the functional equivalent of a commercially unreasonable sale. The equation of a commercially unreasonable failure to sell with a commercially unreasonable sale and the fact that the blameworthy creditor in that regard will suffer the same adverse consequences in either event seemed clear as the Court commented, 266 Md. at 589, 295 A.2d 870:

> While the text of the UCC does not deal, *in ipsissimis verbis*, with the odd situation here presented we think any reasonable interpretation of the meaning of the italicized sentence in the excerpt from § 9–507(2), *supra*, will point the way to a proper appraisal of Bower's conduct, especially when considered in the light of the Official Comment, *supra*.

That predicate having been laid, the *Harris v. Bower* opinion then turned its attention to whether the failure of the creditor to sell the boat at a price reasonably reflecting its market value was the result of the commercial unreasonableness of the creditor's quantitatively and qualitatively inadequate efforts to do so. It concluded that that was, indeed, the case. It pointed out that the boat had been held throughout the course of "two full boating seasons," 266 Md. at 591, 295 A.2d 870, and that it was a chattel that "if not carefully and constantly maintained," would "depreciate at a ruinously pro-

gressive rate." *Id.* The conclusion of the Court of Appeals was clear: "Bower permitted this to happen and this seems to us to be not only not commercially reasonable but also to be utterly lacking in common sense." *Id.*

The holding of the Court of Appeals was clear that the creditor, Bower, had acted in a commercially unreasonable way:

> The uncontroverted evidence seems to support the notion that the boat had a fair market value of $13,900 when he took title and possession. What it was worth at the time of trial we can only guess, since the chancellor made no finding, but it seems safe to assume it was worth a great deal less. The shrinkage in value must be attributed to Bower's conduct which we are persuaded to categorize as not commercially reasonable.

266 Md. at 591–592, 295 A.2d 870.

What also clearly emerged from *Harris v. Bower* is that the creditor, Bower, notwithstanding his commercial unreasonableness, was not absolutely barred from obtaining a deficiency judgment. Indeed, the remand of the case made it clear that he was entitled to a deficiency judgment, to be determined on remand. The only question was one of how large or small that deficiency should be.

The remand was for the express purpose of making the proper arithmetic calculation. It was a simple problem in subtraction. The minuend was not in dispute. It was $21,738.75. The battle was over the appropriate subtrahend. The debtor was urging a large subtrahend, a fair market value in the neighborhood of $13,900, which would yield a relatively smaller remainder or deficiency. The creditor, on the other hand, was hoping for a much smaller subtrahend, a market value in the neighborhood of $4,500, which would yield a proportionately higher remainder or deficiency.

Both sets of figures, however, stand for the same proposition that the failure of a creditor to conduct a commercially reasonable sale, unlike the failure of a creditor to give notice, will not constitute an absolute bar to a deficiency judgment.

If that were not the case, no exercise in subtraction would have been necessary. The remainder would have been zero as a matter of law.

## H. The Unsettled Law: The Alternative to an Absolute Bar

The unusual procedural posture of *Harris v. Bower* makes its holding a trifle oblique. The message is nonetheless clear that the sanction imposed on a creditor for a commercially unreasonable sale will not be that of an absolute bar to any deficiency judgment. We cannot read into *Harris v. Bower*, however, any clear message as to what the alternative sanction should be. It may be that of "set-off," with the burden of establishing a subtrahend higher than the commercially unreasonable sale price cast squarely on the debtor. It may, on the other hand, be that of a "rebuttable presumption," with the burden of establishing that the subtrahend is not presumptively as great as the minuend itself cast squarely on the creditor.

It would, of course, be possible to read the *Harris v. Bower* remand as a deliberate election of the "set-off" approach. That, however, would probably be a case of reading more into the work of art than the artist ever intended. The predicate for such a reading would be the two sentences:

> We think the chancellor could very well find that *the appellant is entitled* to a credit of $13,900. We shall remand the case for his further consideration in this regard. (emphasis supplied).

266 Md. at 592, 295 A.2d 870.

Such a reading, however, would probably be attributing a conscious decision to a mere *sub silentio* action that was not the result of conscious choice. What we now call the "rebuttable presumption" approach had not significantly developed by the time that *Harris v. Bower* was decided in 1972, although there had been faint inklings in that regard. There is no clue or shred of evidence that *Harris v. Bower* considered it as a possibility, however, or even considered that there was a choice to be made between alternative sanctions to the abso-

lute bar. In terms of choosing an alternative sanction, therefore, we conclude that we are writing on a clean slate.

In making a conscious policy choice between the "rebuttable presumption" approach and the "set-off" approach as an alternative to an absolute bar, we conclude that the "rebuttable presumption" rule represents a fair accommodation between the legitimate interests of the debtor and the residual interests of even a creditor whose actions have not necessarily been commercially reasonable and is, therefore, the preferred approach. This was the position taken by the Supreme Court of Kentucky in *Holt v. Peoples Bank of Mt. Washington,* 814 S.W.2d 568 (Ky.1991). It weighed the two alternatives to an absolute bar and concluded that the "rebuttable presumption" rule was a better approach:

> The second and third approaches described by Professors Leibson and Nowka are substantially the same except as to the allocation of the burden of proof. In our view, the second approach is preferable. It begins with a presumption that the collateral is worth at least the amount of debt it secures and the burden is cast upon the secured party to prove that its commercial unreasonableness did not result in diminished proceeds, or if it did, by what amount. Upon failure of the secured party to prove that its conduct did not diminish the proceeds, the presumption that the collateral is of sufficient value to satisfy the debt would control and the claim for deficiency would be forfeited. If, in such circumstances, a secured party is unwilling to depend entirely upon the view, if any, that its conduct did not result in diminished proceeds, it may present evidence as to the amount of damage it caused and such sum will be deducted from the deficiency. To avoid application of the presumption that the collateral is of sufficient value to satisfy the debt, a secured party whose conduct has been found to be commercially unreasonable must prove that its conduct did not cause damage or if it did, by what amount."

814 S.W.2d at 571.

As part of this widespread trend toward the "rebuttable presumption" rule, Massachusetts, in *Shawmut Bank, N.A. v.*

*Chase,* 34 Mass.App.Ct. 266, 609 N.E.2d 479 (1993), was even more persuasive:

Massachusetts has rejected the forfeiture approach. The issue whether Massachusetts would adopt the rebuttable presumption or the set-off approach was expressly left open. . . .

As between two approaches, we think the rebuttable presumption approach, which has more widespread acceptance elsewhere, is fairer. Generally, the facts concerning any sale of collateral are peculiarly within a creditor's knowledge, and a debtor who has not been notified of such sale would be at a disadvantage in trying to prove the extent of the resulting loss. Moreover, it seems more appropriate, and more likely to encourage compliance, to place the burden of proof on the party who failed to live up to the requirements of the Code than on the innocent party. (citations omitted).

609 N.E.2d at 483.

The Supreme Court of New Mexico, in *Clark Leasing Corp. v. White Sands Forest Prod.,* 87 N.M. 451, 535 P.2d 1077 (1975), rejected the "absolute bar" approach in a case involving a commercially unreasonable sale, catalogued a large number of American jurisdictions adopting the "rebuttable presumption" approach, described in detail the operation of that approach, and then concluded:

We believe simple considerations of fair play mandate the adoption of this rule for New Mexico.

87 N.M. at 456, 535 P.2d at 1082.

### I. The Jury Instruction: Error, Perhaps, But Not the Error Alleged

As we have earlier pointed out, the judge's instruction to the jury as to what constituted commercial reasonableness and as to the verdict it should return if it found commercial reasonableness was a model instruction. When the trial judge turned his attention to what the jury should do if it found that the sale was not conducted in a commercially reasonable

manner, however, the instruction given was not correct. Notwithstanding the fact that we are affirming the judgment in this case, we hasten to point out that we are by no means placing our *imprimatur* on the instruction in that latter regard actually given. We are not.

The instruction did not recognize the "rebuttable presumption" rule or seek to explain it, as any instruction hereafter should do. When it came to the issue of fair market value, the instruction did not allocate the burden of proof to the creditor, lest the presumption that the value was sufficient to wipe out the entire debt remain unrebutted.

Notwithstanding our conclusion that the instruction was erroneous, we are nonetheless affirming the trial court. That calls for some brief explanation. The limited contention raised by the Rudens was that the trial judge committed error by declining to give their requested instruction No. 2 or its equivalent, which would have informed the jury that, if it found commercial unreasonableness, the Bank was absolutely barred from recovering any deficiency award. As we have discussed at length, that is not the law and the trial judge was, therefore, correct in refusing to give such an instruction. The alleged error urged on us by the Rudens was, we hold, not an error at all.

With respect to any follow-up instruction as to what the jury might be able to do by way of some deficiency judgment even if it found commercial unreasonableness, the Rudens took no position. They did not even recognize the possibility of any lesser or alternative sanction, let alone a choice between alternative sanctions. They requested no jury instruction dealing with such a possibility. They made no objection in that regard to the instruction that was actually given.

With respect to the objection timely made and the contention preserved for appellate review, there was no error. With respect to the error that actually occurred, there has been no objection, then or now, and there is nothing preserved for appellate review. Plain error? Hardly. The "rebuttable presumption" rule is a relatively arcane nuance of the law

never heretofore discussed in Maryland. The error was subtle, not plain.

### Instructions Only Proper on Issues
### Supported by Evidence

■ The Rudens also contend that the judge erred in failing to give the following requested instruction to the jury:

As just stated, one of the issues in dispute between the Bank and the Rudens is whether the Bank purchased the vessel itself. The law does not allow the Bank to purchase the vessel at a private sale. If you determine that the Bank purchased the vessel itself, and the purchase was made in a private sale, the Bank is not entitled to a deficiency judgment and your verdict on the Bank's claim must be for the defendants.

"A litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it." *Levine v. Rendler*, 272 Md. 1, 13, 320 A.2d 258, 265 (1974). The trial court, in this case, found that that instruction was not supported by the evidence. We agree.

There was no dispute that: 1) the Bank held a public sale in an attempt to sell the Rudens' boat on January 27, 1987; 2) bidding opened at $35,000, but no bids were received; 3) the public sale was a nullity because the boat was still in federal custody; and 4) the boat was sold in a private sale to two men from Florida for $12,500. It is further uncontroverted that a letter was sent to the Rudens in July, 1987 incorrectly stating that the boat had been sold for $35,000, the amount of the opening bid at the public sale.

The confusion that generated the controversy surrounds the documentation that was prepared by a documentation company to comply with Coast Guard regulations and to complete the transfer of title to the two purchasers of the boat after the private sale had taken place. Evidence was offered that the documentation company prepared two sets of bills of sale: one to the Bank for Thirty–Five Thousand Dollars ($35,000) and

one to the purchasers for Twelve Thousand Five Hundred Dollars ($12,500).

The documentation company, to be prepared for any contingency, had prepared two sets of documents. One set, however, was meaningless because it related to the aborted sale in January, 1987, that turned out to be an utter nullity. Out of 1) the Bank's uncontrovertedly incorrect letter to them in July, 1987, and 2) the meaningless set of documents prepared by the documentation company that referred only to a nullity, the Rudens have concocted some convoluted theory that the Bank purchased the boat and thereby violated the provisions of § 9–504(3). In a mental sleight-of-hand that we are confessedly not quick enough to follow, the Rudens are attempting somehow to spin a factual reality out of two undisputed unrealities.

The actual evidence in the case showed indisputably that there was only one valid sale. The first sale, a public sale in which bids were opened at $35,000, was a nullity. The second sale, a private sale, was the only valid sale, and uncontradicted evidence, in the form of a written contract and a check, established that the boat was sold to two purchasers for $12,500. There was no support in the evidence for the requested instruction. We find no error.

### *Private Sale Not Foreclosed*

■ The Consumer Loan Note and Security Agreement signed by the Rudens stated, in its pertinent part, that:

(4) **Repossession and Sale of Collateral:** If I default, I will deliver the Collateral to you, or you can repossess it without either notice to me or any court proceedings. In either event, *you have the right to (but are not required to) sell the Collateral at public sale to reduce the amount owed to you by me.* If the amount of the sale proceeds are not enough to pay all amounts owed under this Note and Security Agreement (including any costs which you incur for insurance, repossession, storage, repair or sale of the Collateral), you have a right to obtain a deficiency judgment

against me for the balance which is still owed. (emphasis supplied).

The Rudens contend that the contract did not authorize the Bank to sell the boat at a private sale. They argue that the Bank's statement that it had the right to sell the boat at public sale is a waiver of its 9–504(3) right to sell the boat at either a public or a private sale. Thus, the Rudens assert that the circuit court erred in failing to instruct the jury that the Bank was not entitled to a deficiency judgment if it sold the boat at a private sale.

The trial court found that the Bank did not waive its rights under 9–504(3). We agree. The contract states that, although the Bank is permitted to sell the boat at a public sale, it is not required to do so. The contract does not explicitly state that the Bank is permitted to sell the boat at a private sale, but neither does it affirmatively waive the Bank's statutory right. The words "but are not required to" leave open the possibility that another type of sale is contemplated and permitted. We see no error.

### Inadmissible Hearsay

In November, 1986, the Bank had the boat appraised by Ed Rowe & Associates. Edward D. Rowe, III, a marine surveyor and consultant located in Fort Lauderdale, Florida, performed the survey. Rowe's report stated that the boat's appraised value was $45,000 and detailed its condition. At trial, the Rudens were not permitted to introduce Rowe's report into evidence. The Rudens were allowed, however, to cross-examine an officer of the Bank as to the contents of the report. They contend that the trial court abused its discretion in failing to admit Rowe's report into evidence. We disagree.

The Rudens contend that Rowe's report is not hearsay under the theory that it is a declaration offered against the Bank by the Bank's agent or servant. *B & K Rentals & Sales Co. v. Universal Leaf Tobacco, Co.*, 324 Md. 147, 596 A.2d 640 (1991). They fail, however, to set forth how Rowe is either a servant of the Bank or its agent, and the evidence does not

support their assertion. *See generally Chevron U.S.A. v. Lesch,* 319 Md. 25, 32, 570 A.2d 840, 844 (1990) (master/servant relationship only exists when employer has right to control and direct servant in performance of work); *Mercedes–Benz of North America v. Garten,* 94 Md.App. 547, 557, 618 A.2d 233, 237 (1993) (actual agency relationship exists when there is manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act).

Rowe's report is hearsay in that it is written evidence of a statement made out of court that is offered in court by the Rudens to prove the truth of the matter asserted therein, the value and condition of the boat. *Aetna Casualty & Sur. Co. v. Kuhl,* 296 Md. 446, 452, 463 A.2d 822, 826 (1983), *quoting* C. McCormick, *Law of Evidence* § 246, at 584 (2d ed. 1972). No argument or showing was made that Rowe was unavailable to be called as a witness. Therefore, Rowe's report is inadmissible hearsay, and we find no abuse of discretion on the part of the circuit court in failing to admit it into evidence.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.*